

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| RYAN FERGUSON, | ) | |
| | ) | |
| Respondent-Appellant, | ) | WD82090 Consolidated with |
| | ) | WD82197 |
| v. | ) | |
| | ) | OPINION FILED: |
| ST. PAUL FIRE AND MARINE | ) | December 10, 2019 |
| INSURANCE COMPANY, ET AL., | ) | |
| | ) | |
| Appellants-Respondents. | ) | |

**Appeal from the Circuit Court of Boone County, Missouri**
The Honorable Glen A. Dietrich, Judge

Before Division Three: Alok Ahuja, Presiding Judge, Gary D. Witt, Judge and Anthony
Rex Gabbert, Judge

St. Paul Fire & Marine Insurance Company ("St. Paul") and Travelers Indemnity

Company ("Travelers") (collectively "the Insurers") appeal from the Circuit Court of

Boone County's judgment of partial summary judgment in favor of Ryan Ferguson

awarding an equitable garnishment in the amount of $5,354,000.00. The Insurers raise two

allegations of error and request this Court reverse the judgment and direct the circuit court

to enter summary judgment in their favor. In his cross-appeal, Ferguson raises one

allegation of error and asks this Court to order the circuit court to amend its judgment to

award prejudgment and post-judgment interest at the statutory rate of nine percent. We affirm.

## Factual Background[1]

On March 10, 2004, Ferguson was arrested and charged with robbery and homicide in Boone County, Missouri, and was convicted on October 21, 2005. He was incarcerated from the date of his arrest until his conviction was vacated on November 12, 2013. *Ferguson v. Dormire,* 413 S.W.3d 40 (Mo. App. W.D. 2013). The State elected not to retry Ferguson on the charges, and he was discharged from custody.

On March 10, 2014, Ferguson initiated a lawsuit against the City of Columbia ("Columbia") and five of its police officers in the U.S. District Court for the Western District of Missouri alleging the officers violated Ferguson's constitutional rights and engaged in malicious prosecution.[2] Columbia tendered the defense of the action to the Insurers under its insurance policies and the Insurers denied coverage. First, the Insurers asserted that the underlying 'wrongful acts' committed by the officers occurred two years before St. Paul's policy was in effect. Second, the Insurers asserted that "injuries for malicious prosecution and related civil rights violations are manifest at the time of indictment or arraignment," and because Ferguson was arraigned two years before St. Paul's policy was in effect, neither insurer owed a duty to defend the suit or indemnify the officers for the judgment.

---

[1] The facts set out in the circuit court's judgment are undisputed.

[2] The case was captioned as *Ryan Ferguson v. John Short, et al.*, Case No. 2:14-CV-04062-NKL. The district court's findings and judgment are not before us on appeal. Furthermore, the Insurers do not dispute that they are bound by any facts that were determined in the underlying district court case that were necessary to the judgment. *Allen v. Bryers*, 512 S.W.3d 17, 33 (Mo. banc 2016).

During the course of the lawsuit, Columbia and its officers entered into a partial settlement agreement with Ferguson under section 537.065.[3] The agreement provided that Columbia would pay Ferguson $500,000 and another insurance company, which is not a party to this appeal, would pay Ferguson a minimum of $2,250,000 regardless of any subsequent damage award. Columbia and its officers did not contest liability, and the district court held a bench trial to determine damages. On July 10, 2017, the district court found the officers and Columbia liable for the constitutional violations and awarded Ferguson a sum of $10,000,000, providing $1,000,000 in damages for each year of Ferguson's incarceration. Additionally, the district court awarded $150,000 for Ferguson's cost of defense in the criminal trial and $854,000 in attorneys' fees for the civil action. Ferguson's total award was $11,004,000.00.

Columbia and its officers were insured by Law Enforcement Liability ("LEL") insurance policies through St. Paul from October 1, 2006, through October 1, 2010, and insured by a similar LEL policy through Travelers from October 1, 2010, through October 1, 2011. As a judgment creditor, Ferguson petitioned the circuit court for an equitable garnishment against the Insurers on January 5, 2018. Ferguson and the Insurers filed cross-motions for summary judgment. The parties stipulated that the facts were undisputed, and the only issue before the circuit court was the extent of coverage provided by St. Paul's and Travelers's policies.

Under the terms of its policy, St. Paul agreed to:

---

[3] All statutory citations are to RSMo 2016 unless otherwise indicated.

pay amounts any protected person[4] is legally required to pay as damages *for covered injury or damage that*:

- results from law enforcement activities or operations by or for [Columbia];
- *happens while this agreement is in effect*; and
- is caused by a wrongful act that is committed while conducting law enforcement activities or operations.

[St. Paul will] consider damages to include the attorneys' fees of the person or organization bringing the claim if such fees are awarded, or paid in a settlement, for covered injury or damage. . . .

Injury or damage means bodily injury, personal injury, or property damage.

Bodily injury means any harm to the health of other persons. It includes care, loss of services, or death that results from such harm.

Harm includes any of the following:
- Physical harm, sickness, or disease.
- *Mental anguish*, distress, injury, or illness.
- *Emotional distress*.
- Humiliation.

Personal injury means *injury, other than bodily injury,* caused by any of the following wrongful acts:
- False arrest, detention, or imprisonment.
- Malicious prosecution. . . .
- *Violation of civil rights protected under any federal, state, or local law*.

(emphasis added).

At some point, St. Paul merged with Travelers, and Columbia renewed its St. Paul policy under the Travelers's name. At the time of renewal, Travelers offered to "adjust any claims under [the] new Travelers policy based upon the terms and conditions of either [the] expiring St. Paul policy or [the] new Travelers policy, *whichever is broader. . . .*"

---

[4] The circuit court found that the officers were protected persons under the policy, which is not challenged on appeal.

4

(emphasis added). Like the St. Paul policy, the Travelers policy covers "'bodily injury', 'property damage' or 'personal injury' [] caused by a 'wrongful act' committed by [Columbia] or on [Columbia's] behalf while conducting law enforcement activities or operations." Additionally, the Travelers policy contained, what is commonly referred to as a "deemer" clause, which states that "[injuries] caused by the same 'wrongful act' or 'related wrongful acts' will be deemed to occur when the first part of such [injury] occurs." Because of the "deemer" clause in the Travelers policy, the circuit court found that St. Paul's policy provided broader coverage for the claims in this action. For this reason, the court applied the terms of St. Paul's coverage for all five policy years.

Each policy had self-insurance retention endorsements, which reduced the Insurers' liability. St. Paul's policy had a $500,000 self-insurance retention for each policy year, and Travelers had a $500,000 self-insurance retention for each wrongful act. The court found that St. Paul's policy would have reduced the Insurers' liability by $2,500,000 and Travelers would have only reduced the Insurers' liability by $500,000, and therefore the court found that Travelers's coverage was broader for the purposes of the self-insurance retention. The court used the Travelers's self-insurance retention provisions in calculating its award.

On July 25, 2018, the circuit court awarded Ferguson partial summary judgment and ordered equitable garnishment against the Insurers for $5,354,000.00. In calculating the award, the circuit court assessed $1,000,000 for each of the five years that Ferguson was incarcerated within the policy period and assessed $854,000 in attorneys' fees for a sum of $5,854,000, which was then reduced by $500,000 pursuant to the self-insurance retention provision of the policy. The court also awarded "interest calculated at the statutory rate

5

applicable to federal district court judgments."  The court made an alternative finding that the St. Paul's policy language was ambiguous because the policy lacked "a temporal requirement stating when a 'wrongful act' must occur for there to be coverage, nor [did the policy] predicate coverage on the date of 'first injury.'"  Both parties appealed.

## Analysis

The Insurers allege two points of error on appeal.  First, they argue that the circuit court misapplied the law asserting that coverage under St. Paul's policy was not triggered because Ferguson's injury "happened" before the policy period began.  Second, they argue that the circuit court incorrectly found that St. Paul's policy was ambiguous.

On his cross appeal, Ferguson raises one point alleging that the circuit court erred because it awarded interest at the "interest calculated at the statutory rate applicable to federal district court judgments" rather than awarding prejudgment and post-judgment interest at the rate of nine percent as required by section 408.040.

## Standard of Review

Appellate review of the grant of summary judgment is *de novo*.  *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). Summary judgment will be affirmed if the movant is entitled to judgment as a matter of law and no genuine issues of material fact exist.  *Id*. at 377.  Here, the parties agree that there are no genuine issues of material fact, and each party argues they are entitled to judgment as a matter of law.  "Generally, an order denying a party's motion for summary judgment is not a final judgment and is therefore not subject to appellate review." *Schroeder v. Duenke*, 265 S.W.3d 843, 850 (Mo. App. E.D. 2008).  "However, the denial

6

of a motion for summary judgment may be reviewable when, as in this case, the merits of the motion for summary judgment are intertwined with the propriety of an appealable order granting summary judgment to another party." *Id*. (internal quotation omitted). Therefore, we must decide if either party is entitled to judgment as a matter of law.

### Insurers' Point One

In their first point on appeal, the Insurers allege the circuit court misapplied the law in finding the Insurers owed an obligation to indemnify and defend[5] Ferguson for a portion of the district court's judgment. The Insurers argue that no covered injury or damage "happened" during the policy period, and for that reason neither of the Insurers' policies provide coverage.

Because at the time Columbia renewed its LEL coverage in October 2010, Travelers offered to enforce the broader of the two policies, we must first determine which of the two policies offers broader indemnification to the insured officers for these claims. There are generally two types of LEL policies: "act-based" and "injury-based." WILLIAM G. BECK ET AL., NEW APPLEMAN ON INSURANCE LAW LIBRARY EDITION, § 34.03[1][a] (Jeffrey E. Thomas & Aviva Abramovsky eds., 2019). "Act-based" policies are triggered when an "allegation or existence of one of the policy's defined or enumerated 'acts' [arises] during the policy period." *Id*. "Injury-based" policies are triggered at the "happening of an enumerated 'injury' during the policy period." *Id*.

---

[5] The circuit court judgment does not address whether the Insurers owed a duty to defend but instead found that "[Insurers] must indemnify the [o]fficers for part of Ferguson's judgment." The issue of whether the Insurers owe a duty to defend is not addressed in either Ferguson's or the Insurers' briefs; therefore, we will not address this issue.

> Under an injury-based insuring agreement, the material requirement to invoke coverage is the allegation or existence of one of the policy's defined or enumerated "injuries" during the policy period. Whether or not the causal act or acts that gave rise to the injury occurred during the policy period is irrelevant to the coverage analysis undertaken with a true injury-based insuring agreement.

*Id.* at § 33.04[1][a][ii](internal footnote omitted).

Pursuant to its terms the St. Paul policy applies to "covered injury or damage that . . . happens while this agreement is in effect."  Similarly, the Travelers policy specifies that it "applies to 'bodily injury,' 'property damage' and 'personal injury' only if . . . [t]he 'bodily injury,' 'property damage' or 'personal injury' occurs during the policy period."  Therefore, we find that both policies are "injury-based," but the Travelers policy contains an important limitation which does not appear in the St. Paul policy.  Travelers specifies that "[a]ll [injury] caused by the same 'wrongful act' or 'related wrongful acts' will be deemed to occur when the first part of such [injury] occurs."  The St. Paul policy does not contain a similar "deemer" clause.

Because of this "deemer" clause, the Travelers policy clearly limits coverage in cases like this one, where an insured's actions cause injury over an extended period of time.  Therefore, under the Travelers policy, coverage is triggered only if the injury "first" occurs during its coverage period.  Because St. Paul's policy lacks a similar "deemer" clause, we conclude that St. Paul's policy provides broader coverage for these claims, and the district court's judgment must be analyzed under its terms.

As stated previously, St. Paul's policy provides coverage:

 for covered *injury or damage* that:
* results from law enforcement activities or operations by or for you;

8

- *happens while this agreement is in effect*; and
- is caused by a wrongful act that is committed while conducting law enforcement activities or operations.

*Injury or damage* means bodily injury, personal injury, or property damage.

Bodily injury means any harm to the health of other persons. It includes care, loss of services, or death that results from such harm.

Harm includes any of the following:
- Physical harm, sickness, or disease.
- *Mental anguish*, distress, injury, or illness.
- *Emotional distress*.
- Humiliation.

Personal injury means *injury, other than bodily injury,* caused by any of the following wrongful acts:
- False arrest, detention, or imprisonment.
- Malicious prosecution. . . .
- *Violation of civil rights protected under any federal, state, or local law*.

(emphasis added).

"The interpretation and meaning of an insurance policy is a question of law." *Mansion Hills Condo. Ass'n v. Am. Family Mut. Ins. Co.*, 62 S.W.3d 633, 636 (Mo. App. E.D. 2001). Insurance policies are contracts and a court must start with the language contained within the policy in determining its meaning. *Progressive Preferred Ins. Co. v. Reece,* 498 S.W.3d 498, 502 (Mo. App. W.D. 2016). "The words of a policy must be given their plain and ordinary meaning consistent with the reasonable expectation and objectives of the parties, unless it is obvious that a technical meaning was intended." *Drury Co. v. Mo. United Sch. Ins. Counsel*, 455 S.W.3d 30, 36 (Mo. App. E.D. 2014). When a policy defines a term, courts will normally look to that definition and nowhere else to determine

9

its meaning. *Mansion Hills Condo. Ass'n*, 62 S.W.3d at 638. However, when terms are undefined we give terms their ordinary meaning, which is the meaning that the average layperson would reasonably understand, and "to determine the ordinary meaning of a term, this Court consults standard English language dictionaries." *Martin v. U.S. Fid. & Guar. Co.*, 996 S.W.2d 506, 508 (Mo. banc 1999).

The term "injury or damage" is defined as "bodily injury, personal injury or property damage." As Ferguson suffered no property damage as defined by the policy, Ferguson bears the burden to demonstrate the insurers have a duty to indemnify under either the "personal injury" provision or the "bodily injury" provision.

## A.    Indemnification under the "Personal Injury" Provision

"*Personal injury* means injury, other than bodily injury, caused by" enumerated acts including "malicious prosecution" and "violation[s] of civil rights protected under federal, state, or local law."[6] The district court stated on the record that "I've already made it clear that this award is for damages for a violation of [Section] 1983, the constitutional violations that have been agreed to by [Columbia] for purposes of settlement only." The policy does not define "injury," but the dictionary defines "injury" as:

> 1a: an act that damages, harms, or hurts: an unjust or undeserved infliction of suffering or harm
> 1b: a violation of another's rights for which the law allows an action to recover damage or specific property or both: an actionable wrong
> 2: *hurt, damage, or loss sustained*.

---

[6] Ferguson's district court claims arose under 42 U.S.C. § 1983, and the district court found that the officers violated his civil rights in that the officers fabricated evidence, recklessly or intentionally failed to investigate other suspects, engaged in malicious prosecution, conspired to deprive Ferguson of his constitutional rights, and arrested Ferguson falsely.

10

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED 1164 (2002) (emphasis added). No Missouri court has interpreted this specific contract language, and we look to other jurisdictions as persuasive authorities.

In *Travelers Indemnity Company v. Mitchell*, 925 F.3d 236, 239 (5th Cir. 2019), three men: Ruffin, Bivens, and Dixon were coerced into confessing to the crime of rape, but all three were exonerated by DNA decades later. Their estates brought charges against officers for "civil rights violations, including coercing confessions, fabricating evidence, withholding exculpatory evidence, and prosecuting without probable cause." *Id.* at 240. The government entities that employed the officers were insured by St. Paul, which had identical language to the policy in the instant case. *Id.* at 240-41. The court ultimately held:

> Th[e] temporal requirement [that injury or damage happen while this agreement is in effect] applies only to the injury. The two other requirements for coverage—that the injury resulted from the insured's "law enforcement activities" and was "caused by a wrongful act that is committed while conducting law enforcement operations"—do not have a temporal limitation. [The insurer] thus bargained for an injury-based trigger of coverage, not an act-based trigger. Under the policy's plain terms, [the insurer] must defend[7] any claim in which covered injuries occurred [during the policy period], regardless of when the wrongful causal act occurred.

*Id.* at 241.

---

[7] *Mitchell*, 925 F.3d at 240, addressed whether the insurer owed a duty to defend. "An insurer's duty to defend and duty to indemnify are separate and distinct." *Arch Ins. Co. v. Sunset Fin. Svcs, Inc.*, 475 S.W.3d 730, 733 (Mo. App. W.D. 2015). "The duty to indemnify is determined by the facts as they are established at trial or as they are finally determined by some other means, for example through summary judgment or settlement." *Lee's Summit v. Mo. Public Entity Risk Mgmt*, 390 S.W.3d 214, 219 (Mo. App. W.D. 2012). The duty to indemnify arises when the insured suffers covered losses. *Trainwreck W. Inc. v. Burlington Ins. Co*., 235 S.W.3d 33, 44 (Mo. App. E.D. 2007). In *Mitchell*, 925 F.3d at 240, the duty to defend arose when the complaint made allegations that, if proven, would be covered by the policy; therefore, if the insured were found liable for damages in a court judgment, as in this case, then the insurer would have a duty to indemnify.

11

Further, the *Mitchell* court found that the allegations did not trigger a duty to defend under the definition of "personal injury" because the definition was connected to the torts of false arrest and false imprisonment. *Id.* The court reasoned that "false imprisonment consists of detention without legal process, [and] a false imprisonment ends once the victim becomes held *pursuant to such process.*" *Id.* (quoting *Wallace v. Kato*, 549 U.S. 384, 389 (2007)). The court held that "[t]he inception of legal process predated the [insurers'] policy period by decades, so the policy does not cover injuries *for a claim of false arrest or imprisonment. Id.* (emphasis added). The court ultimately held that St. Paul had a duty to defend because the three men's injuries fell under the definition of "bodily injury," because the men had suffered physical and mental ailments related to their prison conditions. *Id.* 241-42. *See also Chi. Ins. Co. v. City of Council Bluffs*, 713 F.3d 963, 974 (8th Cir. 2013) (Bye, J., dissenting in part and concurring in part) (as opposed to an "occurrence-based" policy, "the Admiral policies plainly and unambiguously include 'damage sustained during the policy term' arising out of a malicious prosecution as a coverage-triggering occurrence, separate and apart from the malicious prosecution itself;" the policy was triggered throughout the wrongful incarceration because the plaintiffs "sustained damage arising out of the malicious prosecution from 1978 through 2003, the year the two men were finally released from prison").[8]

---

[8] "[W]e are not bound to follow Eighth Circuit precedent, [but] we look respectfully to such opinions for such aid and guidance as may be found therein." *Host v. BNSF Ry. Co.*, 460 S.W.3d 87, 102 (Mo. App. W.D. 2015) (internal citation and quotation marks omitted). The majority in *Chicago Insurance Company*, 713 F.3d at 970-71, held that there was "no meaningful distinction" between a policy that had deemed all damages to occur at the onset of injury and a policy that covered "injuries or damages" without a "deemer" clause. 713 F.3d at 970-71. We find the dissent more persuasive.

12

A key distinction between Ferguson's claims and the claims raised in *Mitchell* is that Ferguson's claims arise under the tort of malicious prosecution instead of false arrest or false imprisonment. The torts of false arrest and false imprisonment end at the time of legal process authorizing the victim's continued detention, but unlike injuries flowing from false arrest or imprisonment, which terminate when the victim's continued detention is authorized by legal process, in a malicious prosecution case involving incarceration the tort is not completed, and the accrual of injury does not cease, until the criminal proceeding terminates in the victim's favor. A proceeding ends in the victim's favor when a final judgment is entered on the merits, dismissed by the court with prejudice, or by abandonment of the action. *Linn v. Moffitt*, 73 S.W.3d 629, 633 (Mo. App. E.D. 2002); *see also Heck v. Humphrey*, 512 U.S. 477, 483-84 (1994) ("[A] successful malicious prosecution plaintiff may recover, in addition to general damages, 'compensation for any arrest or imprisonment, including damages for . . . loss of time and deprivation of the society.'") Ferguson's conviction was vacated on November 12, 2013, and the State elected not to retry him. Therefore, Ferguson's malicious prosecution claim did not accrue until that time, and in accord with *Mitchell*, any "personal injury" incurred before November 12, 2013 is covered under the policy so long as the injury was sustained during the policy period.

The Insurers rely in part on *St. Paul Fire & Marine Insurance Company v. City of Waukegan*, 82 N.E.3d 823, 838 (Ill. App. Ct. 2017), where the Court held that an identical LEL policy was not triggered because "[t]he law enforcement *activity* on which those claims were based *occurred* before the policies took effect." (emphasis added). There the

court relied on *Indian Harbor Insurance Company v. City of Waukegan*, 33 N.E.3d 613 (Ill. App. Ct. 2015), which construed a policy that covered wrongful *acts* which "must occur during the policy period." *Id.* at 832; *Indian Harbor*, 33 N.E.3d at 616. Further, the court relied on the reasoning of *St. Paul Fire & Marine Insurance Company v. City of Zion*, 18 N.E.3d 193 (Ill. App. Ct. 2014). In *City of Zion*, 18 N.E.3d at 199, the court interpreted an LEL policy, identical to the instant case, and looked to when the "occurrence trigger[ed] insurance coverage of a malicious-prosecution claim." Most recently in *Sanders v. Illinois Union Insurance Company*, No. 124565, 2019 WL6199651, at *5 (Ill. Nov. 21, 2019), the Illinois Supreme Court noted the policy's classification as an "occurrence-based policy" weighed heavily into its decision, when it held that malicious prosecution occurred at "the time of prosecution." The importance the Court placed on the type of policy it was interpreting further calls into question the reasoning in *City of Zion* and *Indian Harbor*, where the courts applied "act-based" or "occurrence-based" principles to this specific "injury-based" policy.

The Insurers also rely on *St. Paul Guardian Insurance Company v. City of Newport*, No. 2:17-cv-00115-DLB-CJS, 2019 WL 6317873, *11 (E.D. Ky. July 31, 2019), *appeal docketed*, No. 19-5948, (6th Cir. Aug. 27, 2019), where the court found that an insurer did not have a duty to defend or a duty to indemnify when an individual was wrongfully convicted before the inception of an identical policy. The court found that "to 'happen' means 'to take place, to come to pass, occur (typically expressing simple occurrence, with little or no implication of causality); to ensue as an effect or result.'" *Id*. at *8. (citing *Happen*, Oxford English Dictionary Online (3d. ed. 2013)). The court also "recognize[d]

14

that every day [the plaintiff] spent in prison, [he] suffered from injury; obviously, wrongful imprisonment and the resultant physical and dignitary harms that accompany such confinement represents a continuous and ongoing injury." *Id.* Yet, despite the fact that the court found that the plaintiff "suffered from injury" "every day he spent in prison," and that he suffered from a "continuous and ongoing injury" throughout his confinement, the court concluded that the plaintiff's "injuries happened decades earlier and [merely] persisted until [his] release from prison and exoneration." *Id.*

We agree that incarceration is a "physical and dignitary harm" and it causes "continuous and ongoing injury." However, we respectfully disagree with the *Newport* court's conclusion because it is inconsistent with the policy's language and Missouri case law. Under Missouri law, in contract cases the language of the contract is our first – and often, our *only* – resort. We interpret contracts as a layperson would understand them and use dictionaries to determine the meanings of terms when the insurance contract does not provide a definition. *Martin*, 996 S.W.2d at 508; *see, TIG Ins. Co. v. City of Elkhart*, 122 F. Supp.3d 795, 804 (N.D. Ind. 2015) ("[I]t is the language of the insurance contract that governs coverage, not some blanket judge-made rule."). The *Newport* court disregarded the plain language of the policy and the dictionary definition of "happen" and applied various legal precedents to conclude the injury "happened" decades prior to the issuance of the policy. *See Mitchell*, 925 F.3d at 241-42; *City of Zion*, 18 N.E.3d at 200; *City of Waukegan*, 82 N.E.3d at 835-36; *Sarsfield v. Great Am. Ins. Co. of N.Y.*, 833 F.Supp.2d 125, 130-31 (D. Mass. 2008). We fail to see how a court can recognize that a plaintiff "suffer[s]" a "continuous and ongoing injury" every day they are imprisoned, and yet

15

conclude that injury did not "happen" throughout his or her incarceration. Because a layperson purchasing an insurance policy would not and cannot be expected to know the intricacies of these legal precedents, we decline to adopt the *Newport* court's reasoning.

The final case the insurer's rely on is *Lee's Summit v. Missouri Public Entity Risk Management*, 390 S.W.3d 214, 219 (Mo. App. W.D. 2012), where we determined when an occurrence-based policy was triggered in cases of malicious prosecution. In that case, Theodore White ("White") brought suit under Section 1983 for *inter alia* malicious prosecution, wrongful conviction and imprisonment, conspiracy, and suppression of evidence. *Id*. at 217. Missouri Public Entity Risk Management ("MOPERM") insured the City of Lee's Summit, whose police department investigated White, who was prosecuted three times.[9] *Id.* MOPERM's policy provided coverage for each "occurrence," which was defined as "an act . . . that results in injury or damages." *Id*. at 218. However, the policy also contained a "deemer" clause which provided that "all injuries or damages arising out of continuous or repeated exposure to substantially the same general conditions *shall be considered as arising out of one occurrence*." *Id*. (emphasis added). We concluded that the "circumstances justifying application of a multiple trigger [were] absent," and because MOPERM's policy was not in effect at the time White was originally charged with the criminal offense, therefore MOPERM did not have a duty to indemnify under the terms of the policy. *Id.* at 222.

---

[9] In 1999, White was convicted at his first trial, but the conviction was later reversed. White's second trial in 2004 resulted in a hung jury, and White was acquitted at his third trial in 2005. *Lee's Summit*, 390 S.W.3d at 217.

*Lee's Summit* is easily distinguished based on the language of the policy at issue in that case. In *Lee's Summit*, the court construed an occurrence-based policy rather than an injury-based policy, and MOPERM's policy contained a "deemer" clause. In sharp contrast, St. Paul's policy plainly and unambiguously provides coverage if "covered injury or damage . . . happens while this agreement is in effect," and the policy does *not* deem *all* injury caused by a single wrongful act to have occurred when the first such injury is experienced. The policy at issue before us defines "injury" as "*hurt, damage, or loss sustained.*" *supra*. Ferguson testified that he did not have any physical injuries during his incarceration, but at a minimum, Ferguson sustained the loss of liberty, loss of time, and deprivation of society each day of his incarceration and the district court divided the damages related to the year in which they were sustained. Therefore, we conclude that Ferguson met his burden to demonstrate the Insurers have a duty to indemnify Columbia for Ferguson's personal injuries.

### B.    Indemnification under the "Bodily Injury" Definition

Ferguson is entitled to an equitable garnishment if he can demonstrate that he suffered "bodily injury" during the policy period, and the policy defines "bodily injury" as "harm to the health of other persons," and "harm" includes "mental anguish, distress, injury, or illness" and "emotional distress."

In *Mitchell*, 925 F.3d at 241-42, the court held that St. Paul had a duty to defend because the three men's injuries fell under the definition of "bodily injury," because the men had suffered physical and mental ailments related to their prison conditions. Dixon alleged that he suffered multiple ailments caused by "his confinement, including staph

17

infections, chest pains, dizziness, convulsions, blurry vision, infections, . . . and suicidal depression." *Id.* at 242. Dixon suffered "mental anguish, embarrassment, humiliation, [and] emotional distress" when his petitions for early release were denied. *Id.* "Bivens contracted Hepatitis C, which was not properly treated. This hepatitis in turn led to a number of medical problems, including cirrhosis of the liver in 2008 followed by liver cancer." *Id.*

In the instant case, Ferguson testified that he "was permanently damaged as a result of [his] incarceration" but admitted he did not sustain any physical injuries during that time. Ferguson further testified:

> You can't forget the things that you saw in prison. I can't forget sitting in my cell, hearing squeaks above me in the cell above me and hearing people fight and somebody screaming for help and knowing there's nothing you can do about it.
>
> I can't forget sitting in the cell thinking that my [cellmate] at any point in time was going to try to kill me because he didn't like the way that I lived, he didn't like the fact that I left water on the sink, and those tense moments that you couldn't escape from. . . . And I've had to accept the reality that, no matter how hard I've tried to avoid thinking about these things and living with this reality, those are the memories that I have been given.

When Ferguson was asked, "In prison, was there stimulus that caused you to become hyperaware of noises and that sort of thing?" he testified:

> The fact that they never ceased I think is something that is definitely part of that. In prison, jail, especially the hole, people are up all night, they're talking, they're yelling at each other, they're cussing each other out, they're having –they're playing chess from cell to cell. . . . And so all day long, this is all you're hearing is this barrage. And it's a concrete box, and it reverberates. And then again at night and you're trying to go to some sleep, and it continues.

18

When Ferguson was asked, "Did you have any experiences, specific experiences while you were incarcerated where you were in fear of your life?" Ferguson responded, "Quite a few. Quite a few." He described one incident with a cellmate that drew "imaginary lines," and when Ferguson crossed one of the lines his cellmate would "snap out in an instant." The cellmate told him that if Ferguson continued "sitting on this chair and looking at the wall, [the cellmate] thinks I'm looking at him, that [the cellmate's] going to have to basically kick my a** and get rid of me." Ferguson described a potential altercation as a "fight to the death. It's you or it's them, and the consequence is either you're dead or you're getting another charge. . . ."

Ferguson also described being in "double solitary," where he was in a "box" with another prisoner "24/7." He described the situation as:

> [W]hen that happens with another person in the cell with you and they're losing their minds and you're watching it, and they're starting to throw stuff around and they're cussing out the [correctional officers] and the [correctional officers] tell you to lock down, and if you don't put the handcuffs on, then they're going to spray you and mace you and give you a violation. But if you do put the handcuffs on, then that guy is going to attack you with handcuffs on, and it's going to take the [correctional officers] awhile to open the door.

He also described another situation where a cellmate "had a lock in his sock, and he was ready to go at any time." The cellmate wanted one of his friends to be placed in his cell and wanted Ferguson to request a different assignment. The cellmate attempted to "drive [Ferguson] crazy" so that Ferguson would start a fight and the cellmate could retaliate by striking Ferguson with the lock in his sock.

19

Ferguson's testimony is similar to that in *Mitchell*, where he establishes distinct harms suffered during his incarceration. We further find that the events illustrated in Ferguson's testimony are examples of "mental anguish, distress, [or] injury" as contemplated by the parties in the policy's definition of "bodily injury." Therefore, we conclude that Ferguson met his burden to demonstrate the Insurers have a duty to indemnify Columbia for Ferguson's bodily injuries.

**C.    Application**

We recognize that it may raise concerns that we hold a policy provides coverage for injuries resulting from a wrongful act which occurred before the policy incepted. However, we are bound to apply the language of the policy as it is written, and as explained in detail above, the St. Paul policy plainly and unambiguously provides coverage for injuries sustained during the policy period even though the wrongful acts occur before the policy period. Concerns over pre-existing torts can be addressed in other ways—such as through requests for disclosure during the insurance application process; exclusions for wrongful acts, injuries, or losses known to the insured at the time the policy is issued; and through a "deemer" clause, etc. We will not address concerns over pre-existing wrongs by distorting the plain meaning of the language which St. Paul chose to employ to describe its coverage obligations. An insurance company is perfectly capable of providing limitations on its coverage within the language of its policy, such as the limitations contained in the Travelers policy at issue in this case, and they are also perfectly capable of providing broader coverage than is required by the law regarding specific causes of action.

20

Under the policy terms, the Insurers have a duty to indemnify Columbia for Ferguson's injuries or damages sustained during the policy period. The circuit court found that Ferguson sustained injuries or damages during the policy period between 2006 and 2011 under both the "personal injury" and "bodily injury" provisions. The district court awarded Ferguson $1,000,000 for each year of incarceration for a total sum of $10,000,000. Because Ferguson suffered injury and damage during each of the five policy years, the circuit court properly attributed only $5,000,000 of this award to St. Paul's garnishment.

The district court also awarded Ferguson $150,000 for expenses incurred during his original criminal trial and $854,000 in attorney's fees for the civil action in its damages calculation. The circuit court did not include the criminal trial expenses in this equitable garnishment, because those damages preceded the policy period, but included the attorneys' fees for the civil action.[10]

Therefore, Insurers have a duty to indemnify Columbia and its officers for the sum of $5,854,000 reduced by the "self-insured retention" clause. Each policy contains a "self-insured retention" clause, and the trial court applied the retention clause in the Travelers policy because it was broader, which reduced the Insurers' duty to indemnify by $500,000.[11] Thus, the circuit court's equitable garnishment of $5,354,000 was proper. The Insurers' Point One is denied.

## Insurer's Point Two

[10] Ferguson does not dispute the exclusion of the criminal trial expenses, and the Insurers do not specifically dispute the inclusion of the attorneys' fees for the civil action other than their claim that they owe no damages at all under the policy. Therefore, we will not address these issues further.

[11] The Insurers have not challenged the application of the retention clause from the Travelers policy on appeal, and therefore, we will not further address this issue.

21

In their second point, the Insurers allege the circuit court erred in making an alternative finding that the St. Paul insurance policy was ambiguous. Because the express terms of the agreement unambiguously provided coverage for injuries or damages sustained during the policy period, we need not address the issue of ambiguity in this case.

Point two is denied.

### Ferguson's Point One

The circuit court entered its judgment awarding equitable garnishment "in the amount of $5,354,000.00, plus interest calculated at the statutory rate applicable to federal district court judgments." In his only point raised on in his cross-appeal, Ferguson alleges the circuit court erred in failing to provide for prejudgment interest and post-judgment interest at the rate of nine percent required by section 408.040.2 rather than the interest rate set forth in the underlying federal court judgment. Ferguson requests this Court remand with instructions to enter an amended judgment to the extent necessary for Ferguson to collect prejudgment and post-judgment interest on the award at nine percent rather than "statutory rate applicable to federal district court judgments." The Insurers argue that Ferguson has not preserved this error for review. We agree.

Rule 78.07[12] requires a motion for new trial to be filed in order to preserve issues for appellate review in a jury tried case. Previously, it had been held that no motion for a new trial or motion to amend the judgment was required in a case tried without a jury to preserve issues for appeal. However, in December of 2016 the Supreme Court amended

---

[12] All rule references are to Missouri Supreme Court Rules (2019).

22

the provision of Rule 78.07 to add language clarifying that in a case tried without a jury a motion for new trial or motion to amend judgment was unnecessary only if "the matter was previously presented to the trial court."[13]  In *Kohner Properties Inc. v. Johnson*, 553 S.W.3d 280, 287 n.5 (Mo. banc 2018)(*per curiam*), in reviewing a bench trial, the Court wrote that because a party "failed to raise [an allegation of error] before the circuit court even though she could have [and] failed to file an after-trial motion raising such a violation . . . [the] contention [was] not preserved for review in this Court."  We will not convict a trial court of error for issues that were never presented to it.  *Bartsch v. BMC Farms, LLC*, 573 S.W.3d 737, 743 (Mo. App. W.D. 2019).  Similarly, Ferguson did not raise any objection before the circuit court regarding the interest rate to be applied to the judgment, nor did he file a motion for a new trial or a motion to amend the judgment properly putting this issue before the trial court for determination.  Therefore, this point is not preserved for review.

Under Rule 84.13(c), we have discretion to review plain errors affecting substantial rights "when the court finds that manifest injustice or miscarriage of justice has resulted therefrom."  Plain error review is rarely granted in civil cases.  *Mayes v. St. Luke's Hosp. of Kansas City*, 430 S.W.3d 260, 269 (Mo. banc 2014).  We conduct plain error review "if there are substantial grounds for believing that the trial court committed error that is

---

[13] The amended subsection (b) of Rule 78.07 now provides, "(b) Except as otherwise provided in Rule 78.07(c), in cases tried without a jury or with an advisory jury, neither a motion for a new trial nor a motion to amend the judgment or opinion is necessary to preserve any matter for appellate review if the matter was previously presented to the trial court."

evident, obvious and clear and where the error resulted in manifest injustice or miscarriage of justice." *Id*. (internal quotation marks omitted).

Ferguson did not suffer "manifest injustice or miscarriage of justice" as a result of the circuit court's interest award. In fact, the court adopted the very language that Ferguson requested in his proposed judgment submitted to the trial court on July 25, 2018. A party cannot demonstrate manifest injustice, when that party receives the relief it requested. Therefore, we decline plain error review.

Ferguson's Point One is denied.

## Conclusion

The judgment of the circuit court is affirmed.

Gary D. Witt, Judge

All concur

24